**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAYNARD PAUL CUMMINGS, *Petitioner-Appellant*, <br><br> v. <br><br> MICHAEL MARTEL, Warden, California State Prison at San Quentin, <br> *Respondent-Appellee*. | No. 11-99011 <br><br> D.C. No. 2:95-cv-07118-CBM <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
October 9, 2014—Stanford, California

Filed August 11, 2015

Before: Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Chief Judge
Thomas;
Partial Concurrence and Partial Dissent by Judge
O'Scannlain

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Raynard Cummings's habeas corpus petition challenging his conviction for first-degree murder and death sentence for killing Los Angeles Police Officer Paul Verna.

Cummings alleged that the prosecution violated his due process rights under *Turner v . Louisiana*, 379 U.S. 466 (1965), by calling as a witness a deputy who served as a courtroom bailiff and security officer during a portion of Cummings's trial.  The panel held that even under AEDPA's deferential review, the California Supreme Court erred in determining that the bailiff, who told the jury that Cummings had confessed to shooting Verna, was not a key prosecution witness under *Turner*.  The panel affirmed the district court's denial of relief on this claim because the California Supreme Court's determination that Cummings did not satisfy the second *Turner* requirement – that the testifying deputy had continuous and intimate contact with jurors – was neither contrary to nor an unreasonable application of clearly established federal law.

The panel granted a Certificate of Appealability on Cummings's claim that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising peremptory strikes against two prospective African American jurors. The panel concluded that the California Supreme Court did not

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

unreasonably apply *Batson* to the facts in determining that Cummings did not establish that race was a substantial motivating factor in the prosecutor's decision to strike the prospective jurors.

Affirming the district court's denial of Cummings's ineffective assistance of counsel claim, the panel held that the California Supreme Court had a reasonable basis to conclude that Cummings was not prejudiced by his lawyers' presentation of mitigation of evidence at the penalty phase of his trial.

Chief Judge Thomas concurred in part and dissented in part. He agreed with the majority that the *Batson* and ineffective assistance claims should be denied, but dissented from the conclusion that the due process claim must be denied. He wrote that the California Supreme Court's decision to affirm the conviction cannot reasonably be squared with *Turner* and *Gonzales v. Beto*, 405 U.S. 1052 (1972) (per curiam), in which the Supreme Court made clear that a criminal defendant's right to a fair trial is infringed when the government solicits key testimony from a bailiff who associated closely with the jury during the defendant's trial.

Judge O'Scannlain concurred in part, dissented in part, and concurred in the judgment. He concurred in the opinion, except as to Section I.A. He wrote separately to explain why the California Supreme Court's conclusion that the deputy was not a "key witness" under *Turner* must be afforded AEDPA deference.

**COUNSEL**

K. Elizabeth Dahlstrom (argued), Research & Writing Attorney, Sean K. Kennedy, Federal Public Defender, Elizabeth Richardson-Royer, Deputy Federal Public Defender, Office of the Federal Public Defender, Los Angeles, California; Statia Peakhart, Los Angeles, California, for Petitioner-Appellant.

Lance E. Winters (argued), Senior Assistant Attorney General; Kamala D. Harris, Attorney General of California; Dane R. Gillett, Chief Assistant Attorney General; A. Scott Hayward, Deputy Attorney General, Los Angeles, California, for Respondent-Appellee.

# OPINION

McKEOWN, Circuit Judge:

Raynard Cummings was convicted of first-degree murder and sentenced to death for killing Los Angeles Police Officer Paul Verna. The California Supreme Court affirmed his conviction on direct appeal. *People v. Cummings*, 850 P.2d 1 (Cal. 1993). It then denied his petitions for post-conviction relief. The district court denied Cummings's petition for a writ of habeas corpus under 28 U.S.C. § 2254. We affirm.

## FACTUAL BACKGROUND

On June 2, 1983, Los Angeles Police Officer Paul Verna pulled over an Oldsmobile for rolling through a stop sign. During the traffic stop, one or more of the car's occupants shot Verna six times.

At Cummings's trial, he did not dispute that he was one of three occupants in the car when the shooting occurred. He sat in the rear passenger seat, behind a friend, Kenneth Gay, who was riding in the front seat. Cummings's wife, Pamela, was driving.

Both Gay and Cummings were charged with first-degree murder. The government contended that Cummings shot Officer Verna once, then passed the gun to Gay, who got out of the car and fired five more shots. Cummings contested the "two-shooter" theory, claiming that Gay fired all six shots.

Eyewitness accounts varied. Some witnesses lent credence to the two-shooter theory, while others expressed certainty that one person fired all six shots. Through forensic

evidence and a crime scene reenactment, the prosecution sought to demonstrate that the first bullet likely came from Cummings's perch in the back seat.

After nearly six months of trial proceedings, a courtroom deputy named David La Casella overheard a conversation between Cummings and Gay in their respective holding cells. According to La Casella, Cummings told Gay that the bullet described by the medical examiner as "number six" was the "one I put in the m-----f-----"—meaning the victim, Verna. The deputy was removed from his courtroom post and the next court day testified to this exchange.

The jury convicted Cummings of first-degree murder. After a recess, the penalty phase commenced. To support its case for the death penalty, the prosecution introduced evidence that Cummings possessed a "shank" while in jail awaiting trial; participated in the robbery of a vacuum store; and schemed to use poisoned postage stamps to kill Gay and his wife, Robin Gay, to prevent them from testifying at his trial.

The prosecution also tried to introduce aggravating evidence related to Cummings's incarceration in Delaware. During that time, Cummings had altercations with two prison guards and wrote a violent, profanity-laced letter that expressed his desire to kill police officers. Following the California Supreme Court's decision in *People v. Boyd*, 700 P.2d 782 (Cal. 1985), the trial judge ruled that the prosecution could not introduce this evidence as part of its case-in-chief because the altercations and the letter were not crimes. However, the court made clear that it would allow the prosecution to introduce this evidence as rebuttal if Cummings "open[ed] the door" during his mitigation case.

In light of this evidentiary ruling, Cummings's lawyers decided to present a "sterile" mitigation case. They told the court that, for "tactical reasons," they would "very carefully ask [] witnesses not to get into" any subjects that would lead to the admission of rebuttal evidence. They assured the judge they would avoid any discussion of Cummings's "personality or character traits." Instead, his lawyers limited mitigation evidence to Cummings's "biographical information," such as "where he was born, who his parents were, the fact they got divorced, [and] what his schooling was."

In the penalty phase, the defense team put on testimony from three witnesses. A sheriff's deputy testified about violence in jail (presumably to demonstrate Cummings's need to protect himself with a shank). Then, Cummings's older brother Darrell related some of the hardships they faced during their childhood. Darrell told the jury that their parents had "knock-down, drag-out" fights, which once culminated in their mother stabbing their father with a knife. He also explained how their father frequently beat Raynard "extremely hard" with a belt or extension cord. Darrell stated that their mother began drinking to excess when her husband left her, and he revealed that she had recently been in a mental hospital. Finally, Cummings's high school girlfriend testified about his rocky relationship with his family before his incarceration in Delaware.

During closing arguments in the penalty phase, Cummings's lawyers made only passing reference to Cummings's background and personal characteristics, instead arguing that "lingering doubt" about whether Cummings had shot Verna should lead the jury to choose a life sentence over the death penalty.

The jury voted for the death sentence, and the trial court imposed this sentence.

## PROCEDURAL BACKGROUND

In his appeal to the California Supreme Court, Cummings alleged that La Casella's testimony violated his due process rights as defined in *Turner v. Louisiana*, 379 U.S. 466 (1965), and that the prosecution's use of peremptory strikes against two black potential jurors violated *People v. Wheeler*, 583 P.2d 748 (Cal. 1978). The court rejected both claims. *Cummings*, 850 P.2d at 32, 37–38. Justice Mosk dissented as to the *Wheeler* claim. *Id.* at 72.

Cummings next filed a petition for habeas relief with the California Supreme Court, alleging dozens of errors and supported by over 200 exhibits. The court rejected each of his claims as "untimely" and "lack[ing] merit."

Cummings then filed a petition for habeas corpus in the Central District of California on July 22, 1997. The court stayed federal proceedings while Cummings filed additional habeas claims with the California Supreme Court, including a claim that he was denied effective assistance of counsel at sentencing. When those claims were rejected, Cummings filed an amended habeas petition on October 13, 1998. The district court considered and denied each of Cummings's claims over the ensuing years, entering a final judgment denying his petition on July 28, 2011.

The district court granted a Certificate of Appealability for Cummings's claims that La Casella's testimony violated his due process rights and that he was denied effective assistance of counsel at his sentencing proceedings. We

ordered supplemental briefing on Cummings's objection to the peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), and now grant the Certificate of Appealability on that issue.

## STANDARD OF REVIEW

Cummings's petition is governed by the Anti-Terrorism and Effective Death Penalty Act (AEDPA) of 1996. 28 U.S.C. § 2254. We may grant his petition only if the California Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

This is a demanding standard. Cummings is not entitled to relief if the state court is merely "incorrect." Rather, we may only grant his petition if the state court's decision was "unreasonable." *See Renico v. Lett*, 559 U.S. 766, 773 (2010). The Supreme Court recently defined "unreasonable" as a decision "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## ANALYSIS

## I. THE *TURNER* CLAIM—LA CASELLA'S TESTIMONY.

Cummings first alleges that the prosecution violated his due process rights by calling as a witness Deputy David La Casella, who served as a courtroom bailiff and security

officer during a portion of Cummings's trial. La Casella testified that he overheard Cummings talking with Gay in their holding cells during a break in trial proceedings. During that conversation, Cummings stated that the bullet identified by the medical examiner as "number six" was "the one I put in the m-----f-----." Based on the tone and circumstances of the conversation, La Casella understood this statement as Cummings's confession to firing the first shot at Officer Verna. Cummings argues the former bailiff's testimony violated due process because La Casella had undue influence by virtue of his role as the jury's "official guardian."

*Turner* deals with a seldom-litigated principle of criminal procedure, so we begin with an explanation of that case and its lone sequel in the Supreme Court, *Gonzales v. Beto*, 405 U.S. 1052 (1972) (per curiam).

In *Turner*, two deputy sheriffs served both as courtroom bailiffs and prosecution witnesses in a three-day death penalty trial. 379 U.S. at 467. Before trial, the deputies had investigated the murder, interviewed the defendant, and accompanied him to the crime scene where they recovered a cartridge clip from the murder weapon. *Id*. As part of the deputies' investigation, they also elicited incriminating statements and a written confession from the defendant. *Id.*

At trial, the deputies assumed multiple responsibilities. In addition to testifying about their investigation and the defendant's statements, they "drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." *Id.* at 468. This interaction fostered a "close and continual association with the jurors," in which the deputies

"freely mingled and conversed with the jurors in and out of the courthouse during the trial." *Id.*

The Supreme Court held that these circumstances—with courtroom bailiffs moonlighting as star prosecution witnesses—violated due process and subverted the "basic guarantees of trial by jury." *Id.* at 474. The Court explained that a defendant is subject to "extreme prejudice" when a witness against him has "a continuous and intimate association" with members of the jury. *Id.* at 473.

Seven years after *Turner*, the Court in *Beto* again found a due process violation where the prosecution's case "rested almost totally upon the testimony of the country sheriff," who also doubled as courtroom bailiff. 405 U.S. at 1052 (Stewart, J., concurring).[1] Before trial, the sheriff had dictated the defendant's written confession. *Id.* Then, during a one-day trial, the sheriff walked jurors to lunch, ate with them in a private room, and brought them soft drinks in the jury room—all while he took the stand as the key substantive witness against the defendant. *Id.* at 1053–54.

In both *Turner* and *Beto*, the Court based its due process analysis on two factors. First, the Court asked whether the bailiff was a "key witness[]" or testified to some "uncontroverted or merely formal aspect of the case." *Turner*, 379 U.S. at 473. Second, the Court examined the

---

[1] The Court in *Beto* was fractured: Two justices signed on to Justice Stewart's concurring opinion, and two justices dissented. 405 U.S. at 1052, 1056. The remaining four justices concurred only in the result and provided no insight into their reasoning. Here, both parties treat Justice Stewart's concurrence as clearly established law. In any event, Justice Stewart's concurrence does not differ from *Turner* in any respect that is dispositive to this case.

relationship between bailiff and jury to determine whether the official had a "continuous and intimate" relationship that "foster[ed] the jurors' confidence" in his testimony. *Id.* at 473–74; *see also Williams v. Thurmer*, 561 F.3d 740, 743 (7th Cir. 2009) (per curiam) (explaining *Turner's* two-factor test). If both factors are met—that is, where a bailiff was a key witness *and* had a continuous and intimate association with the jury—the defendant has a due process claim under *Turner*. *See Cooper v. Calderon*, 255 F.3d 1104, 1113 (9th Cir. 2001) (rejecting *Turner* claim where second prong, continuous and intimate contact, was not established).

Applying those principles, the California Supreme Court held that events in this case were distinguishable from *Turner* and *Beto*, and that Cummings's "right to a fair trial" was not "undermined by the admission of La Casella's testimony" and therefore did not violate due process. *Cummings*, 850 P.2d at 38. It first noted that La Casella had no role as an investigating officer and was not identified as a witness prior to trial. *Id.* The court held that LaCasella was "not the principal or 'key' prosecution witness." *Id.* The court then characterized La Casella's interaction with jurors as "minimal" and "professional," unlike the deputies in *Turner* and *Beto* who interacted with jurors outside the courtroom and in social settings. *Id.* at 37, 38.

The facts surrounding La Casella's tenure as bailiff and his trial testimony, elicited at an evidentiary hearing in state court, are essentially uncontested. As a result, our inquiry focuses on whether the California Supreme Court unreasonably applied *Turner* to those facts—a mixed question of law and fact properly analyzed under § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 385–90 (2000).

Under § 2254(d)(1), we must determine whether the California Supreme Court's opinion "*resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.*" (emphasis added). The "unreasonable application" standard therefore applies to the state court's ultimate decision, not to components of its legal reasoning. *See LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 734 (5th Cir. 2011) ("We review the state court's 'ultimate decision' for unreasonableness." (citation omitted)).

Because *Turner* only applies where the testifying deputy was *both* a key witness and had continuous and intimate contacts with jurors, the California Supreme Court's reasonable resolution of either prong suffices.

### A.  LA CASELLA'S TESTIMONY.

The threshold inquiry under *Turner* turns on the significance of the witness's role at trial.  The California Supreme Court concluded that La Casella "was not the principal or 'key' prosecution witness" and therefore did not come within the ambit of *Turner*.  *Cummings*, 850 P.2d at 38. The trial court made no factual findings as to the significance of La Casella's testimony.

*Turner* is not limited to a case where the testifying bailiff is the "principal" or sole witness to a crime—or, as the dissent framed it, a witness "whose testimony is *absolutely necessary* to establish guilt." O'Scannlain Partial Dissent at 43.  The dissent mistakenly elevates "key" witness to linchpin witness.  Instead, the bailiff need only be a "key" witness whose credibility is at issue, as opposed to a witness whose

testimony is "confined to some uncontroverted or merely formal aspect of the case for the prosecution." *Turner*, 379 U.S. at 473; *see Helmick v. Cupp*, 437 F.2d 321, 322 (9th Cir. 1971) (per curiam) (declining to find *Turner* violation where the deputy's testimony "did not concern the crime itself but was directed to matters about which there was no real issue—i.e., the authenticity of the signature on Helmick's confession and the victim's age").

Here, La Casella did not testify about an uncontested issue or a matter of administrative housekeeping. Rather, he told the jury that Cummings had confessed to shooting Officer Verna. This revelation directly contradicted Cummings's defense. Cummings's confession to pulling the trigger ranks as "probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citation omitted). What could be more central or "key" to the case than a confession by Cummings that he shot the victim?

In closing arguments, the prosecutor repeatedly hammered home La Casella's testimony and labeled him "perhaps the most important witness in this case." The prosecutor was not exaggerating. He went on to tell the jury, "His testimony alone should lead you to convict this man of murder with special circumstances." *Cf. United States v. Brandyberry*, 438 F.2d 226, 227 (9th Cir. 1971) (noting that "the testimony of one witness entitled to belief is sufficient to convict").

The government argues that La Casella was not a key witness because other evidence showed that Cummings shot the victim. It points out that five other witnesses testified to self-incriminating statements made by Cummings. But La

Casella's testimony stood out because it came from a reliable source and gelled with the prosecution's theory of the shooting sequence—that Cummings fired the first shot from the back seat and then handed the gun to Gay, who stepped out of the car and fired the final five bullets. Cummings's other self-incriminating statements—relayed to the jury by sheriff's deputies and jailhouse informants—were either vague on this point or contradicted the prosecution's theory of the case. Cummings, for example, purportedly bragged that he "put six" in the victim. To be sure, at least one eyewitness testified that the person in the back seat fired the first shot; other witnesses contradicted that version of events. At any rate, the inquiry here is not whether other evidence also supports the verdict. Under *Turner*, the question is whether a testifying bailiff is a "key" witness, not the *only* witness.

*Turner* does not require, as the California Supreme Court wrote, that the bailiff be the "principal" prosecution witness. *Cummings*, 850 P.2d at 38. Even under AEDPA's deferential standard of review, it is hard to credit the court's application of *Turner*'s first prong. This error is not dispositive, however, because *Turner* requires both a key witness role and a special relationship with the jury.

### B. LA CASELLA'S CONTACTS WITH JURORS.

We now turn to the heart of the *Turner* analysis: whether La Casella had continuous and intimate association with jurors, such that his words had "undue credence" or "undue weight," creating "an aura of probable prejudice." *Helmick*, 437 F.2d at 322–23 (describing *Turner*'s second prong).

The trial judge held an evidentiary hearing on La Casella's contacts with jurors and admitted his testimony after concluding he "probably has one of the most minimal contacts and certainly isn't the type of bailiff that gets involved in talking and kidding and joking with the jurors. . . ." On appeal, the California Supreme Court described the trial court's ruling: La Casella's "association with the jurors was so minimal and so professional that the probative value of his testimony outweighed any prejudice to Cummings from his status." *Cummings*, 850 P.2d at 37. The court agreed with this assessment, holding that La Casella's testimony did not violate *Turner* because he "had relatively little direct contact with members of the jury and was promptly relieved of his courtroom duties when he became a witness." *Id.* at 38. The jury was also "admonished" to judge all witnesses on the same basis and to accord "no greater weight . . . to La Casella because he had been a deputy in the court." *Id.*

We give AEDPA deference to this determination, despite our conclusion with respect to the key witness issue.[2] Unlike

---

[2] Chief Judge Thomas's dissent sidesteps AEDPA and reviews *Turner*'s special relationship prong de novo because, in his view, the California Supreme Court improperly layered a prejudice-balancing test on top of the *Turner* inquiry. *See* Thomas Partial Dissent at 38. A close look at the record reveals the source of this misapprehension of the court's opinion. In state court, Cummings based his challenge on both state evidentiary and constitutional grounds. At the outset of its analysis, presumably in a nod to Cummings's claim under California Evidence Code § 352, the California Supreme Court stated that "the probative value of [La Casella's] testimony outweighed any prejudice to Cummings." 850 P.2d at 37. Significantly, however, the California Supreme Court specifically framed the inquiry as one of due process, not a mere evidentiary issue; quoted extensively the relevant standards from *Gonzalez* and *Beto*; and carefully distinguished Cummings's case with respect to both prongs of

cases where no deference is owed because a claim hinges on a state court's "antecedent unreasonable application of federal law," the contacts requirement in *Turner* is independent of the key witness requirement and stands on its own. The Supreme Court highlighted the difference:

> When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.

*Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

In *Quarterman*, Texas courts misapplied *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986), which prohibits states from executing death-row inmates who are insane. Specifically, the state court unreasonably failed to provide the defendant with "adequate means by which to submit expert psychiatric evidence" via an evidentiary hearing. *Quarterman*, 551 U.S. at 948. De novo review was warranted because the state court's legal evaluation was based on an incomplete set of facts.

In contrast, our case is different because *Turner* sets out two independent lines of inquiry. The question of whether La Casella had intimate and continuous contacts with the jury is not "dependent" on the question of whether he was a key witness. One conclusion is not tied to the other. Bound by

---

*Turner*. *Id.* at 37–38. The California Supreme Court squarely held: "Neither defendant's right to a fair trial, nor his right to jury trial was undermined by the admission of LaCasella's testimony." *Id.* at 38.

§ 2254(d)(1), we ask whether California's application of *Turner's* second requirement was "contrary to, or involved an unreasonable application of, clearly established Federal law."

La Casella served as a uniformed deputy for 57 days of Cummings's six-month jury selection and murder trial. La Casella's tenure was split. He served as a courtroom bailiff during jury selection, and then was a backup bailiff who sat in the back of the courtroom and provided security at trial.

During the long-running jury selection, La Casella was one of two courtroom bailiffs over three months when jurors were individually questioned regarding their death penalty views. La Casella handed excused jurors tickets that indicated they were free to leave, directed prospective jurors to their seats, and greeted jurors.

At the state court evidentiary hearing, La Casella testified that he did not socialize or "chit-chat" with jurors or potential jurors. The roughly two dozen times jurors asked La Casella a question, he usually asked them to write it down and passed the note along to the judge.

During trial, La Casella was reassigned to courtroom security duty. In this capacity, La Casella sat in the back of the courtroom and "ke[pt] an eye" on the audience, defendants Cummings and Gay, and hallway traffic. He continued to have some—albeit diminished—contact with jurors. Specifically, La Casella took notes from jurors on two occasions and responded to jurors who greeted him. He also unlocked the jury room three times when jurors were present.

Based on this record, the California Supreme Court's conclusion that La Casella's association with the jury was

"clearly distinguishable" from the deputies in *Turner* and *Beto* is not unreasonable. In *Turner*, the deputies drove jurors to restaurants for each meal and to their lodgings each night, did errands for them, and "freely mingled and conversed with the jurors"—allowing the deputies to "renew old friendships and make new acquaintances among the members of the jury." 379 U.S. at 468, 473; *see also Beto*, 405 U.S. at 1053 (sheriff walked jurors to lunch, ate with them in a private room, and brought them soft drinks in the jury room); *Tong Xiong v. Felker*, 681 F.3d 1067, 1077 (9th Cir. 2012) (emphasizing the "continuous" and "intimate" nature of the contacts in *Turner*). Here, by contrast, the trial judge made a factual finding that La Casella had "minimal contacts" and didn't "get[] involved in talking and kidding and joking with the jurors"—a finding that we presume is correct, and which Cummings offers no reason to doubt. So far as the record discloses, La Casella did not dine, socialize, or otherwise engage with jurors outside the context of official court matters.

Cummings argues that the California Supreme Court erred by failing to give appropriate weight to the length of La Casella's 57-day tenure as bailiff. But as the California Supreme Court noted, La Casella had "relatively little direct contact with *members of the jury* . . . ." *Cummings*, 850 P.2d at 38 (emphasis added). The bulk of La Casella's 57 days in the courtroom came during extended voir dire and included tasks such as handing tickets to excused jurors and thanking them for their service—interactions, in other words, with venire members who never sat on Cummings's jury.

More broadly, Cummings argues that even if La Casella did not socialize with jurors, he was the jury's "official guardian." Cummings urges that *Turner* requires no more,

pointing to its statement that the bailiff-juror "relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial." 379 U.S. at 474.

In no way does *Turner* categorically bar testimony from any law enforcement officer who has served as bailiff during jury selection. Indeed, its two-prong analysis provides a foundation for determining, on a case-by-case basis, whether a bailiff's testimony results in a due process violation. As the Seventh Circuit noted in a similar habeas case, *Turner* "did not say how many or what types of associations would trigger due-process concerns," making the case susceptible to a "range of reasonable interpretations." *Thurmer*, 561 F.3d at 745. La Casella's limited role hardly casts him as the jury's shepard or guardian. And once the jury was selected, he had minimal interaction with members of the jury. We cannot say the California Supreme Court *unreasonably* read *Turner* to require more than purely professional, arm's-length encounters, even if those encounters were spread over a long trial. *See Cooper*, 255 F.3d at 1113 (rejecting *Turner* claim in part because testifying bailiff was "never alone" with jury and "was not singled out as 'trustworthy' to enter the private realm of the jury room during deliberations" (citing *United States v. Pittman*, 449 F.2d 1284, 1286 (9th Cir. 1971) (per curiam)).

In sum, this case is not "materially indistinguishable from a relevant Supreme Court precedent." *Williams*, 529 U.S. at 405. The California Supreme Court's denial of Cummings's *Turner* claim was not unreasonable.

## II. THE *BATSON* CLAIM—THE PROSECUTOR'S PEREMPTORIES.

As an initial matter, the district court did not certify for appeal Cummings's claim that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising peremptory strikes against two black prospective jurors. To warrant a Certificate of Appealability, Cummings must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has instructed that this is a low hurdle, requiring only that "jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (reversing Fifth Circuit and granting COA on *Batson* claim). Cummings has met this threshold burden.

*Batson*'s touchstone is purposeful discrimination:

> A *Batson* challenge has three steps: first, the defendant must make a prima facie showing that a challenge was based on race; second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown purposeful discrimination.

*Cook v. LaMarque*, 593 F.3d 810, 814 (9th Cir. 2010) (quotation marks and citations omitted). In this case, only *Batson*'s third step—purposeful discrimination—is in dispute. This step requires a showing that race was a "substantial motivating factor" in the prosecutor's decision to

strike a prospective juror. *Id.* at 815. Cummings bears the burden of proving discriminatory intent. *Johnson v. California*, 545 U.S. 162, 170–71 (2005).

At trial, Cummings's counsel challenged the prosecutor's use of peremptories against two black prospective jurors, Clarence Broussard and Leon Passmore, under *People v. Wheeler*, 583 P.2d 748 (Cal. 1978).[3] The trial court conducted a hearing and denied both motions, concluding, "[T]here has been an effective showing of why the peremptories were utilized in this case, and there has been no showing of group bias." The trial court's credibility finding is presumed correct and is entitled to "great deference," *Batson*, 476 U.S. at 98 n.21, because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province," *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

The California Supreme Court affirmed the trial court's decision, holding that the "prosecutor adequately justified his actions." *Cummings*, 850 P.2d at 32. The district court denied Cummings's habeas petition on the *Batson* claim.

Once again, under § 2254(d)(1), we consider whether the California Supreme Court unreasonably applied *Batson* to the facts here. Cummings says that our review should be de novo because the California Supreme Court failed to engage in a thorough analysis at *Batson's* step three and instead "merely

---

[3] *Wheeler* is California's equivalent to, and the state-law precursor of, *Batson*. Cummings "preserved his federal constitutional claim because a *Wheeler* motion serves as an implicit *Batson* objection." *Crittenden v. Ayers*, 624 F.3d 943, 951 n.2 (9th Cir. 2010).

recited the reasons advanced by the prosecutor." That approach is incorrect: § 2254(d) applies even where the state court "failed to undertake any meaningful inquiry into direct or circumstantial evidence of the prosecutor's intent in striking the jurors." *Cook*, 593 F.3d at 815–16 & n.2. Even if the California Supreme Court had said *nothing at all*, and issued only a summary denial, § 2254(d) would apply. *See Harrington*, 562 U.S. at 98. Of course that was not the case here.

Turning to the merits, we consider the California Supreme Court's determination in light of the prosecutor's use of a peremptory strike against two of the African American potential jurors.[4] To aid in the task of divining a prosecutor's intent, we employ comparative juror analysis—that is, "'side-by-side comparisons' of the African American panelists who were struck and white panelists who were allowed to serve." *Cook*, 593 F.3d at 815 (citing *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)).

## A.  CLARENCE BROUSSARD.

The prosecutor offered a litany of reasons for striking Broussard from the jury pool—from Broussard's view on the death penalty to his brother's prior run-in with the law.

---

[4] At the 11th hour in this appeal, Cummings argued in his reply brief that the prosecutor racially profiled another black juror who was dismissed for cause. The racial profiling argument was forfeited, because Cummings never made that argument to the California Supreme Court, the district court, or in his opening brief here. *United States v. Scott*, 705 F.3d 410, 415 (9th Cir. 2012) (deeming an argument forfeited for failure to raise it).

On questioning, Broussard admitted that he had voted against the death penalty in a 1976 California referendum and said he would do so again because he did not believe it deterred crime. Striking a juror who opposes the death penalty, even one who promises to apply the law impartially, is a valid and non-pretextual reason for using a peremptory challenge. *See, e.g.*, *Crittenden*, 624 F.3d at 952 (noting that, in death penalty case, prosecutor exercised most of 26 peremptory strikes against jurors "disinclined from a philosophical standpoint to impose capital punishment").

The record also revealed that Broussard's brother was tried and convicted of robbery in Los Angeles County five years earlier—by the same District Attorney's Office that prosecuted Cummings. The California Supreme Court surely was not unreasonable to view this reason as non-pretextual. The coincidence of having the same prosecutor's office at the helm goes beyond having a relative who was convicted of a crime, a circumstance that in itself has justified the use of a peremptory strike. *See Murray v. Groose*, 106 F.3d 812, 815 (8th Cir. 1997) (upholding strike of potential jurors whose "relatives . . . had been charged with or convicted of crimes," which led prosecutor to believe "that they would be 'defendant's jurors'").

Cummings claims that the coincidence rationale is pretextual because the prosecutor failed to strike another white juror, even though that juror's brother similarly was arrested for felony marijuana possession. But that juror supported the death penalty, which distinguished him from Broussard. Any comparison between the two jurors is unilluminating.

Finally, the prosecutor said Broussard gave him "dirty looks" in the courtroom. This is also a valid reason for dismissing a potential juror. *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (noting that prosecutors may "take into account tone, demeanor, facial expression" in exercising peremptories).

Taken together, these race-neutral reasons justified the prosecutor's decision to strike Broussard.

Cummings also argues that two other reasons cited by the prosecutor were racially tinged and revealed the prosecutor's true, discriminatory intent. The prosecutor made passing reference to a potential friendship among three black jurors and to Broussard's own statements on race. During voir dire, Broussard said, "I would be less than honest if I said I was not aware that we are trying two black individuals, therefore I was going to make sure that we are fair in terms of the evidence as presented against those individuals." Broussard also revealed that he had been "victimized by racial prejudice being born and raised in this town" and added: "It has had an impact on me in terms of the criminal justice system."

Although these reasons touch on race, the record does not show that the strike was "based on" race or stereotyping. *Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring) ("No matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race."). Broussard made affirmative statements indicating potential bias, which is a far cry from when a prosecutor *assumes* a black juror will be partial to a black defendant. *Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999) (upholding peremptory of juror who believed the criminal

justice system discriminates against minorities and noting that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*.").

Viewed in totality, we have little difficulty holding that the California Supreme Court did not unreasonably uphold the prosecutor's strike of Broussard.

### B. LEON PASSMORE.

The California Supreme Court, over the dissent of Justice Mosk, also upheld the prosecutor's decision to strike Leon Passmore, primarily because Passmore lived close to the crime scene and may have known trial witnesses. *Cummings*, 850 P.2d at 32.

Passmore testified he had lived in West Lakeview Terrace, near the site of the murder, for eleven or twelve years. He also worked at a local high school and testified that if any students were called as witnesses he might know them.

Residency can be a valid reason for exercising a peremptory strike. *See Stubbs v. Gomez*, 189 F.3d 1099, 1106 (9th Cir. 1999) (recognizing that "residence could be a race-neutral factor when applied to a specific juror's suitability to sit in a particular case"). But was Passmore's residency a pretext for discrimination, as Cummings alleges? To support pretext, Cummings points to two venire members who, like Passmore, lived in Lakeview Terrace yet were not struck by the prosecutor.

Significantly, the first comparative juror lived in *East* Lakeview Terrace—"away" from West Lakeview Terrace

where Passmore lived and the shooting occurred.[5] The second venire member, who also lived in Lakeview Terrace, never sat in the jury box, so the prosecutor had no need or opportunity to use a peremptory against her.

The California Supreme Court was reasonable in crediting the prosecutor's residency rationale, given the total lack of proof that similarly situated jurors were treated differently. *See Cook*, 593 F.3d at 817 ("Because no similarly situated white jurors were permitted to serve, the evidence indicates this justification was legitimate and not pretextual.").

Cummings's habeas petition under *Batson* was properly denied.

## III.     THE *STRICKLAND* CLAIM—CUMMINGS'S COUNSEL.

The California Supreme Court summarily denied Cummings's petition alleging ineffective assistance of counsel during the penalty phase of his trial. To prevail under AEDPA, Cummings must demonstrate that there was "no reasonable basis for the state court to deny relief" under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Harrington*, 562 U.S. at 98. Because the California Supreme Court had a reasonable basis to conclude that Cummings was not prejudiced by his lawyers' presentation of mitigation evidence at the penalty phase, "we [] need not

---

[5] As Cummings acknowledged on appeal, this juror himself may have been black. If true, this is yet another reason why he is not a proper subject of comparative juror analysis.

reach [*Strickland*'s] performance prong." *See Wharton v. Chappell*, 765 F.3d 953, 975 (9th Cir. 2014).**[6]**

In *Harrington*, the Supreme Court stressed the deference permeating federal habeas review of ineffective assistance claims. It pointed out that "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." 562 U.S. at 105 (internal quotation marks and citations omitted). The multiple layers of deference create a standard that is "difficult to meet," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Rather, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The crux of Cummings's ineffective assistance claim is that his counsel's presentation of mitigating evidence during the penalty phase did not adequately detail the difficulties he experienced as a child. During state habeas proceedings, Cummings's counsel prepared a "social history report" that detailed his abusive upbringing and eventual descent into drug abuse and violent crime.**[7]** Cummings argues that if the

---

**[6]** In light of this conclusion, we do not address whether Cummings's alternative request for an evidentiary hearing on his counsel's performance is barred by *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

**[7]** The government asserts we cannot consider this evidence because it was contained in a social history report prepared during habeas proceedings, and the report itself is inadmissible hearsay. The report, however, was not prepared to serve as admissible evidence. Rather, it illustrates what mitigation evidence would have been available to a lawyer

jury had been exposed to the contents of this report, at least one juror may have been persuaded to choose life over death. The California Supreme Court had a reasonable basis to conclude otherwise.

The social history report was largely cumulative of testimony that was introduced during penalty phase proceedings. For example, Cummings asserts that the jury did not learn about the extent of the violence in his household. His brother Darrell, however, testified that Raynard was subject to "extremely hard" beatings involving extension cords and belts. He also told the jury that their parents regularly had "knock-down, drag-out" fights that sometimes ended with their parents beating one another with household objects. The jury likewise heard Darrell testify that their mother had substance abuse issues and spent time in a mental hospital. The social history report contains more extensive recitation of her history of drug use, alcohol abuse, and psychiatric hospitalizations, but these details would not have changed the narrative of Cummings's upbringing in any meaningful way.

To the extent the social history report offered mitigating evidence that was not cumulative, it is not compelling. The report notes that Cummings's mother drank alcohol while pregnant. Although evidence that a defendant suffers from

who conducted a reasonable investigation into Cummings's life history. Approving of the use of just such a report in *Wiggins v. Smith*, the Supreme Court instructed that we must "evaluate the totality of the evidence—'both that adduced at trial, and *the evidence adduced in the habeas proceeding[s]*.'" 539 U.S. 510, 536 (2003) (quoting *Williams*, 529 U.S. at 397–98). The social history report was properly presented to the California Supreme Court during habeas proceedings, so we consider its contents.

fetal alcohol syndrome may have a significant mitigating effect, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005), Cummings does not allege that he suffered from this ailment. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 480–81 (2007) (describing defendant's assertion that he was "exposed to alcohol and drugs *in utero*, which may have resulted in cognitive and behavioral deficiencies" as "weak" mitigation evidence). Cummings also points out that the jury never learned that his brother was sexually abused. While evidence that a defendant was sexually abused can be a "powerful" mitigating factor, *Wharton*, 765 F.3d at 977, the fact that Cummings's brother was sexually abused lacks the same force.

The report details some evidence that calls into question Cummings's mental well-being. School records indicate that Cummings exhibited symptoms of trauma in his home. While incarcerated in his early twenties, Cummings exhibited bizarre behavior such as spreading feces on the walls of his prison cell. However, a pre-trial psychiatric evaluation yielded no conclusions that his lawyers saw fit to use as evidence at trial,[8] and even at this stage of the proceedings, Cummings does not claim that he suffers from a mental illness. This evidence of mental instability adds little to his claims of prejudice.

Even if testimony about certain aspects of the social history report would have had some mitigating effect, this strategy would have triggered overwhelming aggravating evidence. *See Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (per curiam) (noting that a "reviewing court must consider all the evidence—the good and the bad—when evaluating

---

[8] The notes from this evaluation appear to have been lost.

prejudice"). Had Cummings's counsel gone beyond a "sterile" life history presentation, the prosecution could have countered with evidence that Cummings assaulted two prison guards and wrote a letter announcing his intention to shoot "pigs" eighteen months before Verna's murder.

Although the prison assaults are relatively minor aggravating factors, introduction of the letter would have been devastating to Cummings's defense. Cummings wrote: "[I]f I got to steal or kill for what I want, I will do that . . . I might die, but the pig – one pig or two – is coming with me, and there will be funerals on both sides this time . . . I will always hate pigs, the man, the system, and any White, Black or whatever who is on that side. I have a bullet for that m-----f-----, too, if he gets in my way." This manifesto would not only have negated sympathy generated by tales of Cummings's troubled upbringing, it also would have undermined any "lingering doubt" about his willingness to shoot a police officer.

The mitigating effect of the evidence that the jury did not hear was limited in scope and would have opened the door to inflammatory and prejudicial aggravating evidence. The California Supreme Court had a "reasonable basis" to conclude that Cummings failed to demonstrate prejudice as a result of his counsel's penalty phase presentation of evidence. We affirm the district court's denial of Cummings's habeas petition as to his ineffective assistance of counsel claim.

## CONCLUSION

Cummings's petition for habeas relief is **DENIED**.

THOMAS, Chief Judge, concurring in part and dissenting in part:

I agree with the majority that Raynard Cummings's equal protection and ineffective assistance of counsel claims should be denied.   I respectfully dissent, however, from the conclusion that Cummings's due process claim must also be denied.   The Supreme Court made clear in *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Gonzales v. Beto*, 405 U.S. 1052 (1972) (per curiam), that a criminal defendant's right to a fair trial is infringed when the government solicits key testimony from a bailiff who associated closely with the jury during the defendant's trial. Because that is precisely what occurred during Cummings's trial, the California Supreme Court's decision to affirm his conviction, *People v. Cummings*, 4 Cal. 4th 1233 (1993), cannot reasonably be squared with *Turner* and *Beto*.  I would therefore grant Cummings's habeas petition.

I

Bailiffs play an important role during criminal trials by maintaining order inside the courtroom and ensuring the safety of jurors and court officers.   But when they step beyond that traditional role by testifying against the accused, their competing interests may deprive the defendant of due process.

Justice Stewart highlighted this danger in *Beto*, focusing on "the great prejudice inherent in the dual role of jury bailiff and key prosecution witness."  405 U.S. at 1055 (Stewart, J., concurring).  He explained:

> Our adversary system of criminal justice demands that the respective roles of prosecution and defense and the neutral role of the court be kept separate and distinct in a criminal trial.  When a key witness against a defendant doubles as the officer of the court specifically charged with the care and protection of the jurors, associating with them on both a personal and an official basis while simultaneously testifying for the prosecution, the adversary system of justice is perverted.

*Id.* at 1055–56; *see also Parker v. Gladden*, 385 U.S. 363, 365 (1966) (noting that "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury"); *Mattox v. United States*, 146 U.S. 140, 149-50 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. . . . Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or *the officer in charge*, are absolutely forbidden . . . ." (emphasis added)).

Recognizing that this risk of "great prejudice" arises whenever a bailiff testifies for the prosecution, the Supreme Court in *Turner* and *Beto* held that the admission of such testimony may sometimes violate a criminal defendant's due process rights.  The Court's due process inquiry in those cases focused on two factors: (1) the importance of the bailiff's testimony and (2) the nature of the bailiff's relationship with the jury.

In analyzing the first factor, the Court examined the extent to which the jury's verdict in each case turned on the credibility of the bailiffs' testimony. *See Turner*, 379 U.S. at 473 (concluding that "the credibility which the jury attached to the testimony of these two key witnesses must inevitably have determined whether Wayne Turner was to be sent to his death"); *Beto*, 405 U.S. at 1053 (Stewart, J., concurring) (referring to the case as one "that turned so largely on [the jurors'] assessment of the sheriff's credibility"). For guidance, it looked at whether the bailiffs had served as "key witnesses" or confined their testimony "to some uncontroverted or merely formal aspect of the case for the prosecution." *Turner*, 379 U.S. at 473; *see also Beto*, 405 U.S. at 1054 (Stewart, J., concurring) (quoting the same language from *Turner*). Because the bailiffs in *Turner* and *Beto* had testified to crucial inculpatory facts, including the defendants' alleged confessions, the Court held that they fell on the "key witness" end of this spectrum. *See* 379 U.S. at 467 (referring to the bailiffs as "[t]he two principal witnesses for the prosecution"); 405 U.S. at 1052 (Stewart, J., concurring) (referring to the bailiff as "the key prosecution witness").

Deputy La Casella's testimony regarding Cummings's alleged confession was similarly crucial to the prosecution during the trial in this case. As the majority notes, La Casella was the only witness—other than a jailhouse informant who later recanted his testimony—to corroborate the coroner's specific theory that Cummings fired the first shot and Gay fired the final five. *See* Slip Op. 14–15. Because multiple forensic experts and at least one eyewitness disputed the coroner's theory of events, La Casella's testimony proved

central to the prosecution's case.[1]  Indeed, the prosecution itself referred to La Casella during its closing argument as "perhaps the most important witness in this case," calling his testimony "obviously very important."  It told the jury: "His testimony alone should lead you to the conclusion to convict" Cummings.

Given the primacy that the state itself attributed to La Casella's testimony, I agree with the majority that "[e]ven under AEDPA's deferential standard of review, it is hard to credit the [state] court's application of *Turner*'*s* first prong." Slip Op. 15.  I would therefore hold that the California Supreme Court's conclusion that La Casella was not a key witness constituted an unreasonable application of clearly established federal law as determined by *Turner* and *Beto*. *See* 28 U.S.C. § 2254(d)(1).  Unlike the majority, however, I would hold that the state court's application of *Turner*'s second prong—regarding the nature of the bailiff's relationship with the jury—also conflicts with these controlling precedents.

In *Turner*, the Supreme Court addressed this prong by noting that a "continuous and intimate association" between a testifying bailiff and the jury would give rise to a due process violation while a "brief encounter" would not. 379 U.S. at 473.  In drawing this distinction, "*Turner*

---

[1] Of the nine eyewitnesses who testified at trial, only one claimed to see Cummings fire the first shot at Officer Verna from the car.  That witness had failed to identify Cummings as the shooter on two prior occasions—during both a police lineup and grand jury proceedings—and admitted that he had previously lied under oath.  The witness also admitted that he had changed his testimony to implicate Cummings only after he and a detective conducted a "walk-through" of the shooting following the preliminary hearing.

recognized that there is a continuum of potential prejudice resulting from different types of contacts" and that the defendant's due process claim depends on the extent of those contacts. *Beto*, 405 U.S. at 1058 (Rehnquist, J., dissenting); *see also id.* at 1054–55 (Stewart, J., concurring) ("[*Turner*] indicated that a mere 'brief encounter,' by chance, with the jury would not generally contravene due process principles.").  To illustrate the prejudicial nature of the bailiffs' contacts with the jury in *Turner*, the Court explained that it "would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs."  379 U.S. at 474.  The fact that the two witnesses had served as bailiffs simply "made the association even more prejudicial."  *Id.*

*Turner*'s contacts inquiry is distinct from the general weighing of probative value and prejudice that California courts typically use to determine the admissibility of evidence.  *See* Cal. Evid. Code § 352 ("The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.").  Unlike that balancing test, *Turner*'s focus is constitutional, not evidentiary, and centers on the potential prejudice resulting from the bailiff's relationship with the jury—without regard to the probative value of the bailiff's testimony.[2]

---

[2] Although the first prong of *Turner*—considering the significance of the bailiff's testimony—requires something akin to a traditional probative-value analysis, the focus of *Turner* nevertheless remains distinct from the admissibility question.  After all, the two *Turner* factors are not weighed against each other but, rather, assessed independently, as the majority

Nevertheless, the California Supreme Court resolved the *Turner* question in this case by applying the balancing test. Rather than examining where La Casella's contacts with the jury fell on the spectrum between "brief encounter" and "continuous and intimate association," the California Supreme Court simply reaffirmed the trial court's ruling that La Casella's "association with the jurors was so minimal and so professional that the probative value of his testimony *outweighed* any prejudice to Cummings from his status." *Cummings*, 4 Cal. 4th at 1290 (emphasis added). The court included its *Turner* analysis under the heading, "Evidentiary Rulings," *id.* at 1288, and concluded the analysis by stating that the trial court "did not err in *admitting* [La Casella's] testimony," *id.* at 1290 (emphasis added). In short, despite the California Supreme Court's passing references to due process, the language and organization of its opinion make clear that it never applied *Turner*'s second prong and, instead, relied on a state evidentiary rule to deny Cummings's due process claim.[3]

---

explains.  *See* Slip Op. at 16–17 (emphasizing that "the contacts requirement in *Turner* is independent of the key witness requirement and stands on its own"). To the extent that the California Supreme Court did consider the two *Turner* factors together here, its decision would not be entitled to AEDPA deference because, as explained above, its resolution of the first *Turner* prong was unreasonable.

[3] Although the majority suggests that the state court's application of the evidentiary balancing test was separate from its application of the *Turner* test, the language and structure of the opinion suggest otherwise. The state court specifically cited the balancing test in the middle of its discussion of *Turner* and *Beto* and, as noted above, situated its analysis of these cases within a broader discussion of the trial court's "Evidentiary Rulings." The court's reliance on the balancing test therefore appears central—not merely incidental—to its resolution of the *Turner* issue.

"[W]hen a state court employs the wrong legal standard, the AEDPA rule of deference does not apply." *Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001). As this court explained in *Frantz v. Hazey*, a state court's "use of the wrong legal rule or framework . . . constitute[s] error under the 'contrary to' prong of § 2254(d)(1)." 533 F.3d 724, 734 (9th Cir. 2008) (en banc); *Price v. Vincent*, 538 U.S. 634, 640 (2003) (explaining that "a decision by a state court is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases'" (citations omitted)). Thus, while we must defer to state courts under AEDPA, we may not permit them to circumvent controlling Supreme Court precedent by resolving federal constitutional issues under their own state evidentiary rules. *See Slovik v. Yates*, 556 F.3d 747, 754 (9th Cir. 2009) (granting habeas petition where the "California Court of Appeal analyzed [the petitioner]'s claim as an evidentiary issue governed by state law, rather than a confrontation question governed by the Sixth Amendment").

In sum, the California Supreme Court's decision to deny Cummings's due process claim is not entitled to AEDPA deference. The court's analysis of the first *Turner* factor was objectively unreasonable while its analysis of the second factor was based on an incorrect legal standard and, thus, contrary to federal law. Because the state court's resolution of Cummings's due process claim is not entitled to deference, this court should review that claim *de novo*. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

II

Reviewing Cummings's due process claim *de novo*, I would grant his petition for habeas relief. La Casella's

testimony was critical to the prosecution's case against Cummings and, as explained above, the trial record easily demonstrates that he was a "key witness" under *Turner*'s first prong. While *Turner*'s second prong presents a closer question, I would hold that it, too, weighs in Cummings's favor since La Casella's contacts with the jury were significant enough to result in prejudice.

First, La Casella served as a bailiff for a much longer period of time than the bailiffs in *Turner* and *Beto*. Although La Casella may not have socialized with the jurors to the extent that the bailiffs did in those cases, he served as bailiff for more than three months during voir dire and continued to serve throughout the first week and a half of witness presentations. In contrast, the bailiffs in *Turner* served for only a three-day trial while the bailiff in *Beto* served for only a one-day trial. The Seventh Circuit has specifically pointed to *Beto* as a basis for granting habeas relief to a petitioner who had been convicted of robbery based on the testimony of a bailiff who served for just one day of trial. *Agnew v. Leibach*, 250 F.3d 1123, 1132 (7th Cir. 2001) (granting habeas petition under pre-AEDPA law based on the bailiff's "continuous association [with the jury] throughout the first day of a two-day trial"). Notably, the Seventh Circuit granted the petition even though the record did not "reveal whether the [bailiff] accompanied any jurors to lunch" or contain any other "information about the deputy's out-of-court contact with the jurors." *Id.*

The nature of La Casella's contacts with the jury likewise suggests that his testimony was unduly prejudicial. He testified that jurors had asked him roughly two dozen questions throughout the course of the trial, that he sometimes greeted jurors as they entered the courtroom, and

that he unlocked the jury room for them on a handful of occasions. Although these encounters might have seemed inconsequential when La Casella was merely a bailiff, once he became the prosecution's star witness, these interactions would have likely taken on added significance for at least some jurors. The standard for determining whether those interactions were permissible under *Turner* is not whether they rose to some abstract level of intimacy. Rather, the proper inquiry is whether it "would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and [a] key prosecution witness[]" who was *not* a bailiff. *Turner*, 379 U.S. at 474; *see also Beto*, 405 U.S. at 1055 (Stewart, J., concurring) (quoting the same language from *Turner*).

In this case, the length and nature of La Casella's association with the jury would have likely precluded him from serving as a witness had he not been assigned to the courtroom as a bailiff during Cummings's trial. Indeed, it is difficult to imagine another witness being permitted to testify after interacting with jurors, however briefly, on more than two dozen occasions over the course of such a lengthy trial. *Cf. Agnew*, 250 F.3d at 1132 ("This was not a chance encounter on an elevator but was a continuous association throughout the first day of a two-day trial."). The fact that these interactions occurred while La Casella was serving as a bailiff—tasked specifically with ensuring the jury's safety—only compounds the risk of prejudice.[4] *See Turner*,

---

[4] The prosecution itself may have sought to exploit this potential prejudice. In its closing argument, it stressed that La Casella was "a deputy sheriff who acted as security in this courtroom," and told the jury, "if you don't convict [Cummings] of first-degree murder with special circumstances, you are telling Deputy La Casella in effect that he lied. I

379 U.S. at 474 ("[T]he role that Simmons and Rispone played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial.").

For these reasons, I would hold that La Casella's testimony infringed Cummings's due process rights and would grant his petition for habeas relief.

O'SCANNLAIN, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I agree with Judge McKeown that the district court's decision to deny the petition for habeas corpus must be affirmed. Therefore, I concur in her opinion, and in its excellent reasoning—except as to Section I.A. I respectfully dissent from Section I.A., and write separately to explain why the California Supreme Court's conclusion that Deputy LaCasella was *not* a "key witness" under *Turner* must be afforded AEDPA deference.

I

I begin by noting that Section I.A. is dicta—whether it is included or excised, the result is the same because, as Section I.B. persuasively explains, Cummings cannot show that the California Supreme Court erred in evaluating *Turner*'s second prong—the "heart of the *Turner* analysis."

don't think you believe that."

Further, Section I.A. is not only unnecessary to resolution of this case, but is, in my view, incorrect. The California Supreme Court was not objectively unreasonable in concluding that a "key" witness under *Turner* must be the "principal" witness—not merely one of several witnesses whose testimony is probative of guilt. Furthermore, because its key witness analysis did not contravene *Turner*, and because its decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," it is our obligation to defer to the state court's conclusion. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks omitted).

## A

The majority opinion[1] concludes that LaCasella was a "key prosecution witness" under *Turner* because he was important—although not necessary—to the state's case. Specifically, the majority notes that: (1) the prosecutor emphasized the importance of LaCasella's testimony to the jury, and (2) no other witness—or more accurately, no other witness of such credibility[2]—provided testimonial support for the government's precise theory of the case.

Although I agree with the majority's conclusion that LaCasella's testimony was important, I disagree with its

---

[1] Because Chief Judge Thomas agrees with Section I.A., I refer to it as part of the "majority opinion."

[2] As the majority notes, LaCasella's testimony was not the only testimony supporting the prosecution's "first-shot" theory— "at least one eyewitness testified that the person in the back seat fired the first shot."

conclusion that the California state court was thus compelled to treat LaCasella as a "key" witness under *Turner*, and with any resulting implications. The majority argues that a "key" witness is *any* witness who testifies to an important issue, beyond "some uncontroverted or merely formal aspect of the case for the prosecution," even when "other evidence [and testimony] also supports the verdict." But *Turner* does not establish that such "important" and "key" witnesses are the same.

While *Turner* "emphasized" that the bailiff-witnesses in that case were the "key witnesses" whose testimony "must inevitably have determined whether Wayne Turner was to be sent to his death," 379 U.S. at 473, this statement does not "clearly establish" that any *important* witness whose testimony is probative of guilt is a "key witness." If anything, *Turner* suggests that a "key" witness is one whose testimony is *absolutely necessary* to establish guilt, as was the case with the two bailiffs in *Turner*. *See* 379 U.S. at 474 (explaining that "Turner's fate depended upon how much confidence the jury placed in these two witnesses"). By contrast, as the majority concedes, LaCasella was only one of several witnesses who testified to Cummings's guilt.

Thus, the California Supreme Court's conclusion that LaCasella "was not the principal or key prosecution witness," *Cummings*, 4 Cal.4th at 1290, is not "objectively unreasonable" and "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White*, 134 S.Ct. at 1702.

II

I agree with Judge McKeown that the denial of Cumming's petition must be affirmed. However, because the California Supreme Court was not "objectively unreasonable" in its interpretation of the minimal Supreme Court guidance on the *Turner* "key" and "principal" witness issue, and, although I concur in the rest of the opinion, I must respectfully dissent from Section I.A.